Chief Judge Breitel.
Petitioner is the natural mother of Gina Marie Bennett, now an eight-year-old girl. The mother in *544 this proceeding seeks custody of her daughter from respondent, to whom the child had been entrusted since just after birth. Family Court ruled that, although the mother had not surrendered or abandoned the child and was not unfit, the child should remain with the present custodian, a former schoolmate of the child’s grandmother. The Appellate Division reversed, one Justice dissenting, and awarded custody to the mother. Respondent custodian appeals.[1]
The issue is whether the natural mother, who has not surrendered, abandoned, or persistently neglected her child, may, nevertheless, be deprived of the custody of her child because of a prolonged separation from the child for most of its life.
There should be a reversal and a new hearing before the Family Court. The State may not deprive a parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances. If any of such extraordinary circumstances are present, the disposition of custody is influenced or controlled by what is in the best interest of the child. In the instant case, extraordinary circumstances, namely, the prolonged separation of mother and child for most of the child’s life, require inquiry into the best interest of the child. Neither court below examined sufficiently into the qualifications and backgrounds of the mother and the custodian to determine the best interest of the child. Consequently a new hearing should be held.
Some eight years ago, the mother, then 15 years old, unwed, and living with her parents, gave birth to the child. Under pressure from her mother, she reluctantly acquiesced in the transfer of the newborn infant to an older woman, Mrs. Jeffreys, a former classmate of the child’s grandmother. The quality and quantity of the mother’s later contacts with the child were disputed. The Family Court found, however, that there was no statutory surrender or abandonment. Pointedly, the Family Court found that the mother was not unfit. The Appellate Division agreed with this finding.
There was evidence that Mrs. Jeffreys intended to adopt the child at an early date. She testified, however, that she could not afford to do so and admitted that she never took formal steps to adopt.
*545 The natural mother is now 23 and will soon graduate from college. She still lives with her family, in a private home with quarters available for herself and the child. The attitude of the mother’s parents, however, is changed and they are now anxious that their daughter keep her child.
Mrs. Jeffreys, on the other hand, is now separated from her husband, is employed as a domestic and, on occasion, has kept the child in a motel. It is significant that Mrs. Jeffreys once said that she was willing to surrender the child to the parent upon demand when the child reached the age of 12 or 13 years.
At the outset, it is emphasized that not involved is an attempted revocation of a voluntary surrender to an agency or private individual for adoption (see Social Services Law, § 383, subd 5; People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185, cert den 404 US 805; Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]). Nor is abandonment involved (see, e.g., Matter of Malik M., 40 NY2d 840). Nor does the proceeding involve an attempted permanent termination of custody (Family Ct Act, § 614, subd 1; § 631; Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96; Matter of Orlando F., 40 NY2d 103; Matter of Ray A. M., 37 NY2d 619). Nor is there involved the temporary placement into foster care by an authorized agency which is obliged to conduct an investigation and to determine the qualification of foster parents before placement of a child in need of such care (see Social Services Law, § 383, subds 1-3; Matter of Jewish Child Care Assn. of N. Y. [Sanders], 5 NY2d 222, 224-225; State of New York ex rel. Wallace v Lhotan 51 AD2d 252, app dsmd 39 NY2d 743).
Instead, this proceeding was brought by an unwed mother to obtain custody of her daughter from a custodian to whom the child had been voluntarily, although not formally, entrusted by the mother’s parents when the mother was only 15 years old. Thus, as an unsupervised private placement, no statute is directly applicable, and the analysis must proceed from common-law principles.
Absent extraordinary circumstances, narrowly categorized, it is not within the power of a court, or, by delegation of the Legislature or court, a social agency, to make significant decisions concerning the custody of children, merely because it could make a better decision or disposition. The State is *546 parens patriae and always has been, but it has not displaced the parent in right or responsibility. Indeed, the courts and the law would, under existing constitutional principles, be powerless to supplant parents except for grievous cause or necessity (see Stanley v Illinois, 405 US 645, 651). Examples of cause or necessity permitting displacement of or intrusion on parental control would be fault or omission by the parent seriously affecting the welfare of a child, the preservation of the child’s freedom from serious physical harm, illness or death, or the child’s right to an education, and the like (cf., e.g., Wisconsin v Yoder, 406 US 205, 213-215; Pierce v Society of Sisters, 268 US 510, 535).
The parent has a "right” to rear its child, and the child has a "right” to be reared by its parent. However, there are exceptions created by extraordinary circumstances, illustratively, surrender, abandonment, persisting neglect, unfitness, and unfortunate or involuntary disruption of custody over an extended period of time. It is these exceptions which have engendered confusion, sometimes in thought but most often only in language.
The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude (cf. Goss v Lopez, 419 US 565, 574; Matter of Winship, 397 US 358, 365; Tinker v Des Moines School Dist., 393 US 503, 506; Matter of Gault, 387 US 1, 47).
Earlier cases, such as People ex rel. Kropp v Shepsky (305 NY 465, 468-469) and People ex rel. Portnoy v Strasser (303 NY 539, 542), emphasized the right of the parent, superior to all others, to the care and custody of the child. This right could be dissolved only by abandonment, surrender, or unfitness. Of course, even in these earlier cases, it was recognized that parental custody is lost or denied not as a moral sanction *547 for parental failure, but because "the child’s welfare compels awarding its custody to the nonparent” (People ex rel. Kropp v Shepsky, 305 NY 465, 469, supra).
Although always recognizing the parent’s custodial rights, the concern in the later cases, given the extraordinary circumstances, was consciously with the best interest of the child. Thus, in People ex rel. Anonymous v Anonymous (10 NY2d 332, 335), in acknowledging the "’primacy of parental rights’”, the court pointed out that "it has never been held or suggested that the child’s welfare may ever be forgotten or disregarded” (10 NY2d, at p 335). And in People ex rel. Scarpetta v Spence-Chapin Adoption Serv. (28 NY2d 185, supra), the ultimate consideration, again given extraordinary circumstances, was the best interest of the child (28 NY2d, at pp 192, 193, n 10). Thus, the court held "that the record before us supports the finding by the courts below that the surrender was improvident and that the child’s best interests—moral and temporal—will be best served by its return to the natural mother” (p 194).
Finally, in Matter of Spence-Chapin Adoption Serv. v Polk (29 NY2d 196, 204), the court rejected any notion of absolute parental rights. The court restated the abiding principle that the child’s rights and interests are "paramount” and are not subordinated to the right of parental custody, as important as that right is (p 204). Indeed, and this is key, the rights of the parent and the child are ordinarily compatible, for "the generally accepted view [is] that a child’s best interest is that it be raised by its parent unless the parent is disqualified by gross misconduct” (p 204).
Recently enacted statute law, applicable to related areas of child custody such as adoption and permanent neglect proceedings, has explicitly required the courts to base custody decisions solely upon the best interest of the child (Social Services Law, § 383, subd 5; Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]; Family Ct Act, § 614, subd 1, par [e]; § 631; see Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96, supra; Matter of Orlando F., 40 NY2d 103, supra; Matter of Ray A. M., 37 NY2d 619, 621, supra; cf. Lo Prestí v Lo Presti, 40 NY2d 522). Under these statutes, there is no presumption that the best interest of the child will be promoted by any particular custodial disposition. Only to this limited extent is there a departure from the pre-existing *548 decisional rule, which never gave more than rebuttable presumptive status, however strongly, to the parent’s "right”.
Such legislative changes conform, of course, to constitutional limitations. Their purpose, because they involve presumptions, or their negation, is only to implement judicial disposition of evidentiary matters in reconciling the "rights of parents” with the "rights of children” in custody dispositions.
But neither decisional rule nor statute can displace a fit parent because someone else could do a "better job” of raising the child in the view of the court (or the Legislature), so long as the parent or parents have not forfeited their "rights” by surrender, abandonment, unfitness, persisting neglect or other extraordinary circumstance. These "rights” are not so much "rights”, but responsibilities which reflect the view, noted earlier, that, except when disqualified or displaced by extraordinary circumstances, parents are generally best qualified to care for their own children and therefore entitled to do so (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204, supra).
Indeed, as said earlier, the courts and the law would, under existing constitutional principles, be powerless to supplant parents except for grievous cause or necessity (see Stanley v Illinois, 405 US 645, 651, supra, in which the principle is plainly stated and stressed as more significant than other essential constitutional rights).
But where there is warrant to consider displacement of the parent, a determination that extraordinary circumstances exist is only the beginning, not the end, of judicial inquiry. Extraordinary circumstances alone do not justify depriving a natural parent of the custody of a child. Instead, once extraordinary circumstances are found, the court must then make the disposition that is in the best interest of the child.
Although the extraordinary circumstances trigger the "best interests of the child” test, this must not mean that parental rights or responsibilities may be relegated to a parity with all the other surrounding circumstances in the analysis of what is best for the child. So, for one example only, while it is true that disruption of custody over an extended period of time is the touchstone in many custody cases, where it is voluntary the test is met more easily but where it is involuntary the test is met only with great difficulty, for evident reasons of humanity and policy.
*549 The child’s "best interest” is not controlled by whether the natural parent or the nonparent would make a "better” parent, or by whether the parent or the nonparent would afford the child a "better” background or superior creature comforts. Nor is the child’s best interest controlled alone by comparing the depth of love and affection between the child and those who vie for its custody. Instead, in ascertaining the child’s best interest, the court is guided by principles which reflect a "considered social judgment in this society respecting the family and parenthood” (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204, supra). These principles do not, however, dictate that the child’s custody be routinely awarded to the natural parent (see Matter of Benitez v Llano, 39 NY2d 758, 759).
Matter of Benitez v Llano is a particularly good example. In Benitez, there was no termination of the parental right to custody and no finding of parental unfitness or abandonment; nevertheless, the court, acting in the best interest of the child, ruled that the child should remain in the custody of a second cousin. This was because of the extended period of the nonparental custody, the attachment of the child to the custodian, and the child’s imminent attainment of majority.
To recapitulate: intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground.
In custody matters parties and courts may be very dependent on the auxiliary services of psychiatrists, psychologists, and trained social workers. This is good. But it may be an evil when the dependence is too obsequious or routine or the experts too casual. Particularly important is this caution where one or both parties may not have the means to retain their own experts and where publicly compensated experts or experts compensated by only one side have uncurbed leave to express opinions which may be subjective or are not narrowly controlled by the underlying facts.
The court’s determination may be influenced by whether *550 the child is in the present custody of the parent or the nonparent (see People ex rel. Grament v Free Synagogue Child Adoption Committee, 194 Misc 332, 337 [Botein, J.]). Changes in conditions which affect the relative desirability of custodians, even when the contest is between two natural parents, are not to be accorded significance unless the advantages of changing custody outweigh the essential principle of continued and stable custody of children (cf. Matter of Ebert v Ebert, 38 NY2d 700, 703-704; Obey v Degling, 37 NY2d 768, 770; Dintruff v McGreevy, 34 NY2d 887, 888).
Moreover, the child may be so long in the custody of the nonparent that, even though there has been no abandonment or persisting neglect by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child. Of course, such a situation would offer no opportunity for the court, under the guise of determining the best interest of the child, to weigh the material advantages offered by the adverse parties. As noted earlier, such considerations do riot determine the best interest of the child (see Matter of Gomez v Lozado, 40 NY2d 839, decided herewith, involving a motherless child in the custody of its grandmother for many years and separated from its father for still more years).
Before applying these principles to this case, a factor should be mentioned which, although not here present, often complicates custody dispositions. The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence, or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient. Yet, even then, circumstances may require that, in the best interest of the child, the unlawful acts be blinked (see Matter of Lang v Lang, 9 AD2d 401, 408-410, affd 7 NY2d 1029).
In this case, there were extraordinary circumstances present, namely, the protracted separation of mother from child, combined with the mother’s lack of an established household of her own, her unwed state, and the attachment of the child to the custodian. Thus, application of the principles discussed required an examination by the court into the best interest of the child.
In reaching its conclusion that the child should remain with the nonparent custodian, the Family Court relied primarily *551 upon the seven-year period of custody by the nonparent and evidently on the related testimony of a psychologist. The court did not, however, adequately examine into the nonparent custodian’s qualifications and background. Also, the court apparently failed to consider the fact that, absent a finding of abandonment or neglect by the mother, or her consent, the nonparent cannot adopt the child (see Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96, 101-102, supra). Family Court’s disposition, if sustained, would therefore have left the child in legal limbo, her status indefinite until the attainment of her majority. For a single example, a question could arise as to whose consent, the parent’s or the nonparent custodian’s, would be necessary for the child to marry while underage (see Domestic Relations Law, § 15, subd 2 [consent of "parent” or "guardian” required]). A similar question could arise with respect to many situations affecting employment and entry into occupations, an adoption, and any other matters requiring the consent of a parent or legal guardian (e.g., General Obligations Law, § 3-105, subd 2, par c; Education Law, § 3230, subd 3, par b; Domestic Relations Law, § 111, subds 2-3).
On the other hand, the Appellate Division, in awarding custody to the mother, too automatically applied the primary principle that a parent is entitled to the custody of the child. This was not enough if there were extraordinary circumstances, as indeed there were. Other than to agree with Family Court that she was not "unfit”, the court did not pursue a further analysis. Most important, no psychological or other background examination of the mother had ever been obtained. There was, therefore, no consideration of whether the mother is an adequate parent, in capacity, motivation, and efficacious planning. Nevertheless, the Appellate Division determination may well be right.
Thus, a new hearing is required because the Family Court did not examine enough into the qualifications and background of the long-time custodian, and the Appellate Division did not require further examination into the qualifications and background of the mother. Each court was excessive in applying abstract principles, a failing, however important those principles are.
At the cost of some repetition, perhaps unnecessary, it should be said, given the extraordinary circumstances present in this case, in determining the best interest of the child, the age of the child, and the fact and length of custody by the *552 nonparent custodian are significant. Standing alone, these factors may not be sufficient to outweigh the mother’s "right” to custody. However, taken together with the testimony of the psychologist that return to her mother would be "very traumatic for the child”, the relatively lengthy period of nonparent custody casts the matter in sufficient doubt with respect to the best interest of the child to require a new hearing. At this hearing, the mother’s adequacy may be explored and positively established, and if so, in connection with the parent’s past visiting it might well weight the balance in her favor. Then too, the circumstances and environment 6f the custodian, the stability of her household, her inability to adopt, her age, and any other circumstances bearing upon the fitness or adequacy of a child’s custodian over the whole period of childhood, are all relevant.
In all of this troublesome and troubled area there is a fundamental principle. Neither law, nor policy, nor the tenets of our society would allow a child to be separated by officials of the State from its parent unless the circumstances are compelling. Neither the lawyers nor Judges in the judicial system nor the experts in psychology or social welfare may displace the primary responsibility of child-raising that naturally and legally falls to those who conceive and bear children. Again, this is not so much because it is their "right”, but because it is their responsibility. The nature of human relationships suggests overall the natural workings of the child-rearing process as the most desirable alternative. But absolute generalizations do not fulfill themselves and multifold exceptions give rise to cases where the natural workings of the process fail, not so much because a legal right has been lost, but because the best interest of the child dictates a finding of failure.[2]
Accordingly, the order of the Appellate Division should be *553 reversed, without costs, and the proceeding remitted to Family Court for a new hearing.

. The child is currently with her mother and will remain there pending final determination of this litigation, a stay of the Appellate Division order having been denied by that court.

. Insofar as the concurring opinion is concerned only the following comments are perhaps necessary. The court has considered the reservations and rejects them. Particularly rejected is the notion, if that it be, that third-party custodians may acquire some sort of squatter’s rights in another’s child. Third-party custodians acquire "rights”—really the opportunity to be heard—only derivatively by virtue of the child’s best interests being considered, a consideration which arises only after, as the cases have always held, the parent’s rights and responsibilities have been displaced. Lastly, the problem is substantive. It is not a matter of evidentiary rules or procedural burdens of proof or going forward. It would not be good for new confusions to be introduced in the analysis of custody cases, each of which, like all cases, may be unique, but still require resolution by the application of universals.