OPINION OF THE COURT
John M. Hunt, J.
On June 5, 2016, Bhanmattie H. (hereinafter paternal grandmother) filed a petition seeking custody of her granddaughter, Sydney H., who is 14 years old. At the time, Sydney’s biological father, Victor H., Jr. (hereinafter father), was deceased and Sydney was living with her biological mother, Roxanne H. (hereinafter mother). On September 26, 2016, after a Matter of Bennett v Jeffreys (40 NY2d 543 [1976]) hearing, Referee Marilyn Moriber found that the paternal grandmother had standing to pursue custody of her granddaughter. On May 16, 2017, pursuant to the Queens County Family Court Trial Part protocol, the matter was assigned to the court for trial.[1] The trial was completed in one day during which only the paternal grandmother and the mother testified. Both the paternal grandmother and the mother seek primary residential and legal custody of Sydney. For the reasons set forth herein, the court awards primary residential and legal custody of Sydney to the paternal grandmother.
The Evidence
Sydney lived with her mother and father in the paternal grandparents’ home since she was an infant. Around late 2003 to early 2004, due to marital discord, the mother moved out of the paternal grandparents’ home. She took Sydney with her, but in less than two weeks’ time, she returned Sydney to the father, who was still living in the paternal grandparents’ home. In 2011, the mother and the father divorced. In connection with the divorce proceedings, the mother consented to the father having primary residential custody of Sydney. Although the mother had visitation, including overnights, she rarely exercised her right to visit with Sydney, and she infrequently, if ever, contributed financially to Sydney’s expenses.
Sydney lived with her father and the paternal grandmother until her father’s death in December 2014. After the paternal grandmother told the mother about the father’s death, on the day after Christmas, the mother showed unexpectedly at the paternal grandmother’s home and took Sydney to live with her *1042 and her new family.[2] Up until that time, the paternal grandmother was Sydney’s primary caregiver. Since the mother refused to allow the paternal grandmother to visit with Sydney, the paternal grandmother sought court intervention. A judge in family court ordered the paternal grandmother to have visitation with Sydney. During those visits, Sydney was sad. She told her grandmother that she was being mistreated by her mother and her mother’s husband, and that she did not want to live with her mother anymore.[3] Sydney told the paternal grandmother that the mother and her stepfather were constantly fighting and, when anything went wrong in the home, they blamed her for it.[4]
In July 2016, after an in camera interview with Sydney, Referee Moriber temporarily returned Sydney to the paternal grandmother’s home. On January 27, 2017, Referee Moriber ordered therapeutic visitation between Sydney and her mother, but Sydney refused to participate.[5] Since Sydney has returned to her paternal grandparents’ home, she is thriving.
Discussion
In a Family Court Act article 6 custody proceeding, the court must make a decision based upon the totality of the circumstances regarding the best interests of the child in furtherance of the child’s welfare and happiness. (See Ekstra v Ekstra, 78 AD3d 990, 990 [2d Dept 2010]; Matter of Paul v Sawyer, 78 AD3d 710, 710 [2d Dept 2010]; see also Matter of Palmer-Cardona v Cardona, 63 AD3d 1162, 1162 [2d Dept 2009]; Matter of Nunn v Bagley, 63 AD3d 1068, 1068 [2d Dept 2009]; Matter of Pappas v Kells, 77 AD3d 952, 953 [2d Dept 2010]; Bourne v Bristow, 66 AD3d 621, 621 [2d Dept 2009].) In making a custody determination, the court must consider factors that include: (1) the custodial parent’s home atmosphere and parental guidance; (2) each parent’s capacity to support the *1043 child’s emotional and intellectual development; (3) each parent’s capability to support the child financially; (4) the proportionality between each parent’s fitness; and (5) the effect a grant of custody to one parent might have on the child’s relationship with the other parent. (See Ekstra, 78 AD3d at 990-991; see also Paul, 78 AD3d at 710-711; Palmer-Cardona, 63 AD3d at 1162-1163; Nunn, 63 AD3d at 1068-1069; Bourne, 66 AD3d at 621.) Custody determinations are left to the sound discretion of the trial court. (See Matter of Williams v Dowgiallo, 90 AD3d 942, 943 [2d Dept 2011] [citing cases]; see also Matter of Kelly v Hickman, 44 AD3d 941, 941 [2d Dept 2007].)
The paternal grandmother’s testimony was honest and heartfelt. In contrast, the mother’s testimony was incredible and troubling.[6] The mother seemed more concerned about receiving validation[7] as Sydney’s mother than a desire for Sydney’s happiness.[8] Absent from the mother’s testimony were details of a close, loving relationship with Sydney, whom she repeatedly referred to as “the child,” as though Sydney were a possession[9] and not her biological daughter.
Sydney has lived with her grandmother practically uninterrupted from the time that she was about a month old until she was 12 years old,[10] and has a bonded relationship with her. The mother never satisfactorily explained her absence from any *1044 portion of Sydney’s young life. When the mother left the paternal grandparents’ home without Sydney, it was her stamp of approval of the paternal grandmother as a fit and competent caregiver. Thereafter, during divorce proceedings, the mother formed an agreement with the father that he would have primary residential custody of Sydney. Since then, she has never filed a petition challenging custody or visitation,[11] and never gave an acceptable, plausible reason explaining why. Even when Referee Moriber switched custody to the paternal grandmother and suspended the mother’s visitation with Sydney by way of a stay away order of protection, the mother never took action to reverse the order.[12]
The court finds that under the totality of the circumstances, in furtherance of Sydney’s welfare and happiness, it is in her best interests to live with the paternal grandmother. Accordingly, in its discretion, after considering the relevant factors, the court awards primary residential and legal custody to the paternal grandmother.
The court hereby vacates the stay away order of protection, dated July 15, 2016, and its progeny, issued against the mother in Sydney’s favor. The court recognizes the mother as Sydney’s biological mother who, without a stay away order of protection in place, is free to either arrange a mutually agreeable visitation schedule with Sydney through the paternal grandmother, or to come back to court to seek court-ordered visitation with Sydney.

. Under the Queens County Family Court protocol, Trial Part judges are assigned to try cases wherein the parties announce readiness for trial in their assignment parts.

. By this point, the mother was living with her second husband and their daughter, Sydney’s half-sibling.

. During trial, the mother conceded that Sydney had expressed a desire to live with her grandparents. {See hearing tr at 118, May 16, 2017.)

. The mother conceded in her testimony that Sydney did not get along with her stepfather. {See hearing tr at 108, May 16, 2017.)

. See Order for Therapeutic Visitation, Fam Ct, Queens County, Jan. 27, 2017, Moriber, Ref., docket No. V-10648/15; see also Making It Work Supervised Visitation Report, Fam Ct, Queens County, Mar. 1, 2017, Marcus, Ph.D., LCSW-R, docket No. V-10648/15.

. The mother’s testimony that the paternal grandmother charged her, but not the father, rent while they lived in the parental grandparents’ home as a family is improbable. (See hearing tr at 80, May 16, 2017.) Moreover, the mother’s testimony that the family was living in a dusty, dirty basement apartment is equally unconvincing, especially in light of the fact that mother, after leaving the paternal grandparents’ home with Sydney back in 2003/ 2004, returned Sydney to those allegedly deplorable conditions because she felt it was a better living situation for Sydney. (See hearing tr at 55, 76, May 16, 2017.)

. When asked what she hoped the court’s decision would be, the mother answered: “I would ask that everybody be fair or equal and that I receive acknowledgment on the fact that I am the mother of ¿his child and she does need a mother.” (Hearing tr at 74, May 16, 2017 [emphasis added].)

. It is clear to the court that the mother never considered Sydney’s happiness as evidenced by her actions after Sydney’s father’s death when she went to the paternal grandmother’s home and removed Sydney without any regard to the emotional impact it might have on her.

. When asked if her visitation with Sydney stopped after the father’s death, the mother replied: “The regular visitation stopped when I found out that he had passed away, because I had—I didn’t have to share custody with anybody. She was mine. I had sole custody.” (Hearing tr at 68, May 16, 2017.)

. Although the mother testified that she left Sydney in the paternal grandparents’ home because she wanted to get her life sorted out, she never sought custody of Sydney when her life situation improved.

. It is the paternal grandmother’s petition upon which the trial took place.

. The court takes judicial notice of the order of protection issued against the mother in Sydney’s favor, and the temporary order of visitation, both which the mother never appealed. (See Temporary Order of Visitation, Fam Ct, Queens County, July 16, 2016, Moriber, Ref., docket No. V-10648/15; see also Temporary Order of Protection, Fam Ct, Queens County, July 15, 2016, Moriber, Ref., docket No. V-10648/15.)